IN THE SUPREME COURT OF THE STATE OF DELAWARE

IN RE: CVS OPIOID
INSURANCE LITIGATION

§
§
§
§
§
§
§
§
§

No. 482, 2024

Court Below: Superior Court
of the State of Delaware

C.A. No. N22C-02-045

Submitted: June 25, 2025
Decided:    August 18, 2025

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and
**GRIFFITHS**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court.  **AFFIRMED**.

David J. Baldwin, Esquire, Peter C. McGivney, Esquire, BERGER MCDERMOTT
LLP, Wilmington, Delaware; Jeffrey L. Schulman, Esquire (*argued*), Stephen Wah,
Esquire, BLANK ROME LLP, New York, New York *for Appellants CVS Health
Corporation and CVS Pharmacy, Inc.*

Garrett B. Moritz, Esquire, R. Garrett Rice, Esquire, Dylan T. Mockensturm,
Esquire, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Michael S.
Shuster, Esquire, Daniel M. Sullivan, Esquire (*argued*), Blair E. Kaminsky, Esquire,
Daniel M. Horowitz, Esquire, Rebecca T. Moonitz, Esquire, HOLWELL SHUSTER
& GOLDBERG LLP, New York, New York; Robert M. Mangino, Esquire, CLYDE
& CO LLP, Morristown, New Jersey; Susan Koehler Sullivan, Esquire, CLYDE &
CO. LLP, Los Angeles, California *for Appellees ACE Property and Casualty
Insurance Company, Federal Insurance Company, Vigilant Insurance Company,
Indemnity Insurance Company of North America, and Westchester Fire Insurance
Company.*

Robert J. Katzenstein, Esquire, Julie M. O'Dell, Esquire, SMITH, KATZENSTEIN
& JENKINS LLP, Wilmington, Delaware; Christopher J. St. Jeanos, Esquire,
Patricia O. Haynes, Esquire, Daniel L. Morris, Esquire, WILLKIE FARR &
GALLAGHER LLP, New York, New York *for Appellees American Home*

*Assurance Company, Lexington Insurance Company, National Union Fire Insurance Company of Pittsburgh, PA, and New Hampshire Insurance Company.* Joseph B. Cicero, Esquire, Gregory E. Stuhlman, Esquire, Kelly E. Rowe, Esquire, CHIPMAN BROWN CICERO & COLE, LLP, Wilmington, Delaware; Adam H. Fleischer, Esquire, R. Patrick Bedell, Esquire, Allyson C. Spacht, Esquire, BATESCAREY LLP, Chicago, Illinois *for Appellees Great American Alliance Insurance Co. (f/k/a American Alliance Insurance Company), Great American Insurance Company of New York (f/k/a American National Fire Insurance Company), Great American Insurance Company, and Tamarack American, Inc.*

Robert K. Beste, Esquire, SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, Delaware; Deborah J. Campbell, Esquire, DENTONS US LLP, St. Louis, Missouri *for Appellees Greenwich Insurance Company, XL Insurance America Inc., and The Continental Insurance Company, individually and as successor by mergers to Niagara Fire Insurance Company.*

Wade A. Adams, III, Esquire, LAW OFFICES OF WADE A. ADAMS, III, Newark, Delaware; Bryce L. Friedman, Esquire, Joshua C. Polster, Esquire, Matthew Penny, Esquire, SIMPSON THACHER & BARTLETT LLP, New York, New York *for Appellees Discover Property and Casualty Insurance Company (n/k/a Travco Personal Insurance Company), Gulf Underwriters Insurance Company, St. Paul Fire and Marine Insurance Company, United States Fidelity and Guaranty Company, and The Travelers Indemnity Company (as successor in interest to Gulf Insurance Company).*

Marc Casarino, Esquire, KENNEDYS CMK LLP, Wilmington, Delaware; Christopher R. Carrol, Esquire, Joshua S. Wirtshafter, Esquire, KENNEDYS CMK LLP, Basking Ridge, New Jersey *for Appellee TIG Insurance Company.*

Bruce W. McCullough, Esquire, BODELL BOVÉ, LLC, Wilmington, Delaware; Karen M. Dixon, Esquire, SKARZYNSKI MARICK & BLACK LLP, Wilmington, Delaware *for Appellees American Guarantee and Liability Insurance Company, American Zurich Insurance Company, and Zurich American Insurance Company, as successor-in-interest to Zurich Insurance Company, U.S. Branch.*

Sean J. Bellew, Esquire, BELLEW LLC, Wilmington, Delaware; Michael A. Kotula, Esquire, Robert A. Maloney, Esquire, RIVKIN RADLER LLP, Uniondale, New York *for Appellees Allianz Insurance Company, Fireman's Fund Insurance Company, Interstate Indemnity Company, and National Surety Corporation.*

2

Louis J. Rizzo, Jr., Esquire, REGER RIZZO & DARNALL LLP, Wilmington, Delaware; Monica T. Sullivan, Esquire, Matthew J. Fink, Esquire, Leena Soni, Esquire, Stephanie M. Flowers, Esquire, NICOLAIDES FINK THORPE MICHAELIDES SULLIVAN LLP, Chicago, Illinois *for Appellees Endurance American Insurance Company and Swiss Re Corporate Solutions Capacity Insurance Corporation f/k/a North American Capacity Insurance Company*.

Philip Trainer, Jr., Esquire, Marie M. Degnan, Esquire, ASHBY & GEDDES, Wilmington, Delaware; Robert A. Kole, Esquire, Caroline M. Trusty, Esquire, CHOATE, HALL & STEWART LLP, Boston, Massachusetts *for Appellees Liberty Insurance Underwriters Inc. and The Ohio Casualty Insurance Company*.

Thad J. Bracegirdle, Esquire, Sarah T. Andrade, Esquire, Emily L. Skaug, Esquire, BAYARD, P.A., Wilmington, Delaware; Sara K. Hunkler, Esquire, RUGGERI PARKS WEINBERG LLP, Washington, D.C. *Appellees First State Insurance Company and Twin City Fire Insurance Company*.

Loren R. Barron, Esquire, KAUFMAN DOLOWICH, Wilmington, Delaware *for Appellees Berkley National Insurance Company and Gemini Insurance Company*.

Kevin J. Connors, Esquire, MARSHALL DENNEHEY, P.C., Wilmington, Delaware; Cheryl P. Vollweiler, Esquire, SKARZYNSKI MARICK & BLACK, New York, New York *for Appellee AXIS Insurance Company*.

**SEITZ,** Chief Justice:

CVS Health Corporation appeals from two Superior Court summary judgment decisions denying CVS insurance coverage from its insurers for lawsuits brought by governments, hospitals, and third-party payors related to CVS's opioid dispensing practices. In both decisions, the Superior Court held that, under our *Rite Aid* decision,[1] the lawsuits do not seek damages because of any specific person's bodily injury or damage to any specific property. After careful review, we affirm.

I.

A.

The opioid epidemic is "one of the largest public health crises in this nation's history."[2] On top of the hundreds of thousands of lives lost, the epidemic has cost the country between $53 and $72 billion annually.[3] To recoup these costs, parties across the United States – including governments, healthcare providers, and third-party payors – have sued opioid manufacturers, distributors, and retailers such as CVS.[4] Over the years, CVS notified its insurers of the lawsuits. For ease of

---

[1] *ACE Am. Ins. Co. v. Rite Aid Corp.*, 270 A.3d 239 (Del. 2022).

[2] *In re Purdue Pharma L. P.*, 69 F.4th 45, 56 (2d Cir. 2023).

[3] *In re Purdue Pharma, L.P.*, 635 B.R. 26, 44 (S.D.N.Y. 2021).

[4] App. to Appellants' Opening Br. at A70 [hereinafter A__] (Opening Br. in Support of Chubb and AIG's Mot. Summ. J. at 6); A2619 (Opening Br. in Support of Insurers' Mot. Summ. J. on Remaining Gov't Lawsuits and Non-Gov't Entity Lawsuits at 13).

4

reference, we will refer to the two groups of insurers in this case as Chubb and AIG, and together the Insurers.[5]

The Insurers wrote similar policies for CVS. Chubb issued at least 26 policies to CVS from 1993 to 2005 and 2008 to 2018 ("Chubb Policies").[6] Under the Chubb Policies, the Chubb insurers agreed to pay whatever CVS "becomes legally obligated to pay as damages because of 'bodily injury' [or] 'property damage' . . . to which this insurance applies."[7] Insurance coverage applies only if the "bodily injury" or "property damage" is "caused by an 'occurrence.'"[8] "Bodily injury" is defined as "bodily injury, sickness or disease sustained by a person," including "mental anguish or mental injury resulting from bodily injury."[9] "Property damage" is defined as "[p]hysical injury to tangible property."[10] "Occurrence" is defined as "an

---

[5] The Chubb insurers are ACE Property and Casualty Insurance Company, Federal Insurance Company, Indemnity Insurance Company of North America, Vigilant Insurance Company, and Westchester Fire Insurance Company (collectively, "Chubb"). The AIG insurers are National Union Fire Insurance Company of Pittsburgh, Pa., American Home Assurance Company, and New Hampshire Insurance Company (collectively, "AIG"). A65 (Opening Br. in Support of Chubb and AIG's Mot. Summ. J. at 1).

[6] A74 (Opening Br. in Support of Chubb and AIG's Mot. Summ. J. at 10) ); A2178 (CVS's Br. Opp'n to Chubb and AIG's Mot. Part. Summ. J. at 5).

[7] A2090 (ACE 2014 Policy at 1). Any differences among the individual Chubb Policies are immaterial in this appeal. *See* A96–110 (App. to Opening Br. in Support of Chubb and AIG's Mot. Summ. J.).

[8] A2090 (ACE 2014 Policy at 1).

[9] A2104 (ACE 2014 Policy at 15).

[10] A2107 (ACE 2014 Policy at 18).

accident."[11]  In other words, under the Chubb Policies, coverage is only available for the amount CVS is required to pay because of bodily injury or property damage. The injury or damage must be caused by an accident.

Some of the Chubb Policies contain a Pharmacist Liability Endorsement modifying coverage for "damages because of 'bodily injury' arising out of a 'pharmacist liability incident.'"[12]  "Pharmacist liability incident" is defined as "an actual or alleged negligent, act, error or omission . . . in the performance of a 'pharmacist professional service.'"[13]  "Pharmacist professional service," in turn, means "[t]he preparation, selling, handling or distribution of drugs, medicine, medical or healthcare-related products or their containers."[14]

AIG issued 36 policies to CVS from 1995 to 2000 and 2002 to 2017 ("AIG Policies").[15]  Under the AIG Policies, the AIG insurers must pay "those sums that [CVS] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."[16]  Insurance coverage applies

---

[11] A2106 (ACE 2014 Policy at 17).

[12] A2145 (ACE 2014 Policy Pharmacist Liability Endorsement at 1).

[13] A2146 (ACE 2014 Policy Pharmacist Liability Endorsement at 2).

[14] *Id.*

[15] A74 (Opening Br. in Support of Chubb and AIG's Mot. Part. Summ. J. at 10); A2179 (CVS's Br. Opp'n to Chubb and AIG's Mot. Part. Summ. J. at 6).

[16] A2219 (AIG 2008 Policy at 1).

only if the "bodily injury" or "property damage" is "caused by an 'occurrence.'"[17] "Bodily injury" is defined as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."[18]  "Property damage" is defined as "[p]hysical injury to tangible property."[19]  "Occurrence" is defined as "an accident."[20]

Some of the AIG Policies contain a Designated Professional Services Druggist Liability Endorsement ("Druggist Liability Endorsement"), which states that "'[b]odily injury' or 'property damage' arising out of the rendering of or failure to render professional health care services as a pharmacist shall be deemed to be *caused by* an 'occurrence.'"[21]  In addition, several AIG Policies contain a Self-Insured Retention Endorsement, which provides that AIG retains the "right but not the duty to defend any 'suit'" seeking damages in connection with the policy.[22]

---

[17] *Id.*

[18] A2228 (AIG 2008 Policy at 11).

[19] A2231 (AIG 2008 Policy at 13).

[20] *Id.*

[21] A2233 (AIG 2008 Policy Druggist Liability Endorsement at 1).

[22] A2247 (AIG 2008 Policy Self-Insured Retention Endorsement at 1).

B.

In response to CVS's coverage requests, the Insurers filed a declaratory judgment action in Superior Court seeking a declaration that they owe no duty to defend CVS.[23] In August 2023, the Superior Court granted partial summary judgment in favor of the Insurers. The court held that the Insurers had no duty to defend CVS in certain government lawsuits.[24] These lawsuits include (1) the bellwether suits brought by Summit and Cuyahoga Counties in Ohio ("Track One Lawsuits") and (2) seven additional lawsuits brought by various governments that the Insurers contend are representative actions ("Additional Representative Lawsuits").[25]

The court first considered the Track One Lawsuits and concluded that, under our *Rite Aid* decision, they are not subject to coverage.[26] The court determined that the *Summit* complaint is "substantively identical" to the *Cuyahoga* complaint

---

[23] *In re CVS Opioid Ins. Litig.*, 301 A.3d 1194, 1198 (Del. Super. Ct. 2023) [hereinafter *First Superior Court Decision*]. CVS subsequently filed a third-party complaint against additional insurers ("Joining Insurers"). *Id.* These insurers sought a declaration that they had no duty to defend or indemnify CVS for the Track One Lawsuits and the Additional Representative Lawsuits. *Id.*

[24] *Id.*

[25] The additional lawsuits are bellwether lawsuits brought by Lake and Trumbull Counties in Ohio ("Track Three Lawsuits"), lawsuits brought by Nassau and Suffolk Counties in New York, and lawsuits brought by the Cherokee Nation, Philadelphia, and Florida. A72 (Opening Br. in Support of Chubb and AIG's Mot. Part. Summ. J. at 8); A87 (Opening Br. in Support of Chubb and AIG's Mot. Part. Summ. J. at 23).

[26] *First Superior Court Decision* at 1212.

considered in *Rite Aid*.[27] The court also determined that the language of the policies here are "substantively identical" to the *Rite Aid* policy language.[28] As such, the Court found that the Track One Lawsuits were brought by governments seeking recovery of economic losses, not recovery for "bodily injury" incurred by themselves or on behalf of the injured persons.[29]

The court next considered the Additional Representative Lawsuits and determined that there were "no substantial differences" between these lawsuits and the Track One Lawsuits.[30] The court therefore concluded that, under *Rite Aid*, the Additional Representative Lawsuits are not subject to coverage.[31]

The court also examined the Pharmacist Liability Endorsement and the Druggist Liability Endorsement and found that they are "of [n]o [m]oment" in the coverage analysis.[32] The court was unpersuaded by CVS's argument that the "arising out of" language in the endorsements should be construed broadly in favor of coverage.[33] According to the court, this language modifies the "occurrence"

---

[27] *Id.*

[28] *Id.*

[29] *Id.* at 1212–13.

[30] *Id.* at 1213.

[31] *Id.*

[32] *Id.* at 1214.

[33] *Id.*

requirement and does not change the threshold requirement that the underlying claim seeks "damages because of 'bodily injury.'"[34]

Next, the court examined the property damage allegations in the Track One Lawsuits and the Additional Representative Lawsuits.[35] The court found coverage unavailable because the complaints did not allege specific property damage that would satisfy the policies' "because of 'property damage'" requirement.[36]

Last, the court held that the Insurers did not owe a duty to indemnify CVS for the opioid losses claimed in the lawsuits.[37] The court explained that, because the Track One and Additional Representative Lawsuits did not depend on proof of personal injury, CVS did not demonstrate how factual developments in the underlying cases could trigger the Insurers' duty to indemnify.[38] The court was also skeptical that anything could "come about that will transmute or transform the various governmental claims into those for bodily injury or property damage covered by the [p]olicies."[39] The court concluded that, because the Insurers had no duty to

---

[34] Id. at 1214–15.

[35] Id. at 1215.

[36] Id. at 1215–16.

[37] Id. at 1216.

[38] Id. at 1216–17.

[39] Id. at 1217.

defend the Track One and Additional Representative Lawsuits, the Insurers also had no duty to indemnify.[40]

In March 2024, following the First Superior Court Decision, the parties stipulated that the decision resolved 2,151 additional government suits ("March 2024 Stipulation").[41] The parties later agreed that 293 lawsuits "brought by or on behalf of individuals" were not subject to the March 2024 Stipulation.[42] The parties could not agree, however, whether the March 2024 Stipulation applied to 218 lawsuits brought by government entities, hospitals, and third-party payors.

To resolve the dispute over the 218 lawsuits, the parties cross-moved for summary judgment. During briefing, the parties identified "exemplar lawsuits." CVS identified *Fresno* as the government exemplar; *Clinch County*, *Dallas County Hospital District*, *Bunkie General Hospital*, *Bristol Bay*, *Lester E. Cox*, *Bon Secours (Maryland)*, and *Fayetteville* as the hospital exemplars; and *Southern Tier* as the third-party payor exemplar.[43] The Insurers identified *Fresno* and *Clinch County* as the government exemplars, *Bon Secours (Kentucky)*, *Booneville*, and *Eastern Maine*

---

[40] *Id.*

[41] App. to Appellees' Answering Br. at B185–86 [hereinafter B___] (March 2024 Stipulation at 2–3).

[42] B962 (Joint Stip. and Ord. for a Stay Pending Appeal at 3).

[43] *See generally* A3510–44 (Opening Br. in Support of CVS's Mot. Part. Summ. J.).

as the hospital exemplars; and *Louisiana Assessors* and *Laborers Welfare Fund* as the third-party payor exemplars.[44]

In August 2024, the Superior Court granted partial summary judgment in favor of the Insurers for the government, hospital, and third-party payor lawsuits. The court found that the government lawsuits' complaints did not allege "specific, individualized injury, but instead [allege] an array of opioid-related statistics and increased levels of budgetary spending."[45]

The court also found that coverage was unavailable for the non-government lawsuits. According to the court, the hospital lawsuits "seek damages for the aggregate financial strain placed on their health system as a result of the opioid epidemic," and the third-party payor lawsuits allege "generalized economic harm caused to its members in the form of increased prescription purchases and related opioid addiction treatment."[46] None of these lawsuits, concluded the court, satisfied the specific and individualized injury required by the policies under *Rite Aid*.[47]

---

[44] *See generally* A2603–45 (Opening Br. in Support of Insurers' Mot. Part. Summ. J. on Remaining Gov't Lawsuits and Non-Gov't Entity Lawsuits).

[45] *In re CVS Opioid Ins. Litig.*, 2024 WL 3882607, at *6 (Del. Super. Ct. Aug. 20, 2024) [hereinafter *Second Superior Court Decision*].

[46] *Id.*

[47] *Id.* at *7.

The court was also unpersuaded by CVS's argument that Delaware's duty to defend does not require allegations of specific and individualized injuries. As the court explained:

> While *Rite Aid* held that organizations that directly care for or treat injured persons may be within the classes of plaintiffs covered by the policies' insurance, *Rite Aid* did not hold that membership in such a permitted plaintiff-class inexorably qualifies lawsuits that seek recovery for non-derivative economic loss into claims for personal injury.[48]

In addition, the court, relying on largely the same reasoning as it provided in the First Superior Court Decision, held that the Insurers did not owe a duty to indemnify the government and non-government lawsuits.[49]

C.

On appeal, CVS argues that the Superior Court erred by (1) finding that the endorsements did not provide broader coverage than the *Rite Aid* policies, (2) concluding that the lawsuits do not allege damages because of bodily injury or other covered harms, and (3) granting summary judgment under the indemnity-only policies before the issue became ripe. We review the Superior Court's grant of summary judgment and its interpretation of insurance contracts *de novo*.[50]

---

[48] *Id.*

[49] *Id.* at *7–8.

[50] *ConAgra Foods, Inc. v. Lexington Ins. Co.*, 21 A.3d 62, 68 (Del. 2011) (citations omitted).

13

II.

In *Rite Aid*, we held that insurance policies covering lawsuits "for" or "because of" personal injury do not require insurers to defend their insureds when the plaintiffs in the underlying lawsuits seek only their own economic damages.[51] We recognized three classes of plaintiffs who were within the scope of the insured's coverage under the relevant policies: (1) the person injured, (2) those recovering on behalf of the person injured, and (3) people or organizations that directly cared for or treated the person injured.[52] For claims involving a "class three" plaintiff, coverage is available only if the plaintiff seeks to recover the costs of caring for an individual's personal injury.[53]

As we explained, "[t]here must be more than some linkage between the personal injury and damages to recover 'because of' personal injury."[54] Coverage was unavailable under the policies "unless [the damage] is connected to the personal injury, independently proven, and shown to be caused by the insured."[55] Had the "[c]ounties r[u]n public hospitals and sued Rite Aid on behalf of these hospitals to

---

[51] *Rite Aid*, 270 A.3d at 241.

[52] *Id.*

[53] *Id.*

[54] *Id.* at 250.

[55] *Id.* at 251.

14

recover their actual, demonstrated costs of treating bodily injuries caused by opioid overprescription," coverage would most likely have been available.[56] But that was not the case.

Here, the Chubb and AIG Policies contain the same "because of" language at issue in *Rite Aid*.[57] CVS argues, however, that the policies' endorsements – the Pharmacist Liability Endorsement and the Druggist Liability Endorsement – broaden coverage enough to trigger coverage.[58] CVS claims that "there are now three confirmed interpretations" of the endorsements – the Superior Court's holding that they "change nothing," the Insurers argument that they broaden coverage but not "in any relevant way," and CVS's argument that they broaden coverage to the damages in the underlying lawsuits.[59] CVS contends that all three interpretations are reasonable and any ambiguity must be resolved in favor of CVS.[60]

---

[56] *Id.* at 253–54.

[57] In *Rite Aid*, the policy at issue provided coverage for "[d]amages *because of* 'personal injury.'" *Id.* at 243–44 (emphasis added). The Chubb Policies provide coverage for "damages *because of* 'bodily injury' [or] 'property damage' . . . to which this insurance applies." A2090 (ACE 2014 Policy at 1) (emphasis added). The AIG Policies provide coverage for "those sums that [CVS] becomes legally obligated to pay as damages *because of* 'bodily injury' or 'property damage' to which this insurance applies." A2219 (AIG 2008 Policy at 1) (emphasis added). Property damage coverage is addressed later in this opinion.

[58] Opening Br. at 27–30.

[59] Reply Br. on Appeal of Defs.-Below/Appellants at 2–3 [hereinafter Reply Br.].

[60] *Id.* at 3.

We disagree. The Chubb Policies cover amounts that CVS "becomes legally obligated to pay as damages *because of* 'bodily injury' [or] 'property damage' . . . *to which this insurance applies*."[61] The Pharmacist Liability Endorsement amends the policies by providing coverage for "damages *because of* 'bodily injury' *arising out of* a 'pharmacist liability incident.'"[62] The endorsement does not, however, modify the requirement that damages still must be "because of" bodily injury or property damage. Rather, it merely modifies (here, broadened) the "occurrence" requirement under which "this insurance applies" to include "bodily injury" meaningfully linked to a "pharmacist liability incident."[63]

The same reasoning applies to the AIG Policies and endorsements. The AIG Policies cover "sums that [CVS] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' *to which this insurance applies*."[64] The Druggist Liability Endorsement amends the policies by providing coverage for "'[b]odily injury' or 'property damage' *arising out of* the rendering of or failure to

---

[61] A2090 (ACE 2014 Policy at 1) (emphasis added).

[62] A2145 (ACE 2014 Policy Pharmacist Liability Endorsement at 1) (emphasis added).

[63] *See In re Alexion Pharm., Inc. Ins. Appeals*, 2025 WL 383805, at *6 (Del. Feb. 4, 2025). In *Alexion*, we interpreted "arises out of" as requiring some "meaningful linkage" between the conditions imposed in the insurance policy. *Id.* As we explained, although these terms are "paradigmatically broad" and should be construed broadly, the "linkage must be meaningful and not tangential." *Id.* (citation omitted).

[64] A2219 (AIG 2008 Policy at 1) (emphasis added).

16

render professional health care services as a pharmacist[,]" for such circumstances "shall be deemed to be *caused by* an 'occurrence.'"[65] Again, the endorsement does not modify the requirement that the damage still must be "because of" bodily injury or property damage. The Druggist Liability Endorsement merely modifies the policies' "occurrence" requirement.

We conclude that (1) the Chubb and AIG Policies are similar in all material aspects to the relevant *Rite Aid* policy provisions and (2) the Pharmacist and Druggist Liability Endorsements do not alter the requirement that the damage must be "because of" bodily injury or property damage.

## III.

CVS argues that the Superior Court erred by holding that coverage was unavailable for the nine representative government lawsuits. CVS makes a three-part argument. First, CVS contends that the nine representative lawsuits satisfied *Rite Aid*'s "specific and individualized" injury standard for direct coverage. Second, CVS contends that the nine representative lawsuits satisfied *Rite Aid*'s "specific and individualized" injury standard for derivative claims. And third, CVS contends that the nine representative lawsuits are "potentially covered" as "property damage" under the policies.

---

[65] A2233 (AIG 2008 Policy Druggist Liability Endorsement at 1) (emphasis added).

A.

In *Rite Aid*, we held that an insured requesting direct coverage must demonstrate that the underlying plaintiff sought "to recover its costs incurred in caring for bodily injury" and show "it treated an individual with an injury, how much that treatment cost, and that the injury was caused by the insured."[66] Applying this rule, we found that the Track One Lawsuits did not bring "personal injury damage claims for or on behalf of individuals who suffered or died from the allegedly abusive prescription dispensing practices."[67]

CVS contends that all nine cases – including the two Track One Lawsuits already reviewed by this Court in *Rite Aid* – meet this requirement.[68] CVS points to two categories of allegations in the underlying complaints that it claims satisfy the *Rite Aid* requirements. The first category contains allegations specifying the numbers of residents treated, the medication provided, the number of doses, and the cost per dose:

- Treating 17,500, 16,844 and 15,561 people for opioid-use disorder in 2019, 2018 and 2017 respectively, while incurring "significant increased costs for these services during this period[.]"[69]

---

[66] *Rite Aid*, 270 A.3d at 252.

[67] *Id.* at 246.

[68] Opening Br. at 32.

[69] A1915–16 (*City of Philadelphia* Compl. ¶ 590).

18

- "The City [of Philadelphia] administered nearly 10,000 doses of naloxone in 2015 . . . . The City pays approximately $37 per dose for naloxone."[70]

- The City of Philadelphia provided Suboxone, "which costs approximately $450 per month per person."[71]

- The City of Philadelphia provided Vivitrol "which costs approximately $1,000 per month per person."[72]

These allegations do not, however, demonstrate that the underlying plaintiff "treated *an individual* with an injury" "*caused by the insured*."[73]  These allegations therefore do not meet the individualized and specificity requirements set forth in *Rite Aid*.

The second category contains more general allegations of costs incurred to treat the injured and care for the deceased.

- "Opioid-related deaths generally require an autopsy and toxicology screen . . . . The number of autopsies at the Medical Examiner's office has risen about 20 percent in three years . . . . The increase, largely due to opioid deaths, required a doubling in the budget for supplies and materials (body bags, safety equipment, gowns, etc.) and the hiring of a new assistant medical examiner. There were also increased costs for toxicology tests. These costs are funded by the City."[74]

---

[70] A1921 (*City of Philadelphia* Compl. ¶ 606).

[71] A1917 (*City of Philadelphia* Compl. ¶ 595).

[72] A1918 (*City of Philadelphia* Compl. ¶ 596).

[73] *Rite Aid*, 270 A.3d at 252.

[74] A1920 (*City of Philadelphia* Compl. ¶ 603).

19

- "[T]he Summit County Medical Examiner's Office has faced increased costs of overtime, laboratory, toxicology and other costs. Between 2012 and 2016, there was a 47% increase in autopsies, a 436% increase in toxicology lab costs to identify new drugs, mostly synthetic opioids that have swept up individuals already addicted to opioids, and a 100% increase in the costs to transport the bodies."[75]

- "The State of Florida is expending extraordinary resources to address these [deaths] and other social problems resulting from the opioid crisis and will continue to expend resources addressing these problems."[76]

- The additional costs of "burying the dead."[77]

- "[T]he costs of . . . medical care, therapeutic and prescription drugs, and other treatments for patients suffering from opioid-related addiction, overdoses, or disease[,]" and "opioid-related counseling and rehabilitation services[.]"[78]

- Spending "millions of dollars each year to provide and pay for health care, services, pharmaceutical care and other necessary services and programs on behalf of residents[.]"[79]

- Creating "a host of services to assist people suffering from opioid addiction and reduce overdose deaths."[80]

---

[75] A351 (*Summit County* Compl. ¶ 728).

[76] A2052 (*State of Florida* Compl. ¶ 425).

[77] A138 (*Summit County* Compl. ¶ 20); A484 (*Cuyahoga County* Compl. ¶ 19); A845 (*Lake County* Compl. ¶ 15); A1140 (*Trumbull County* Compl. ¶ 15).

[78] A1050 (*Cherokee Nation* Compl. ¶ 14).

[79] A1353 (*Suffolk County* Compl. ¶ 2).

[80] A1359 (*Suffolk County* Compl. ¶ 26).

- "[H]aving incurred and continue to incur costs related to opioid addiction and abuse, including, but not limited to, health care costs[.]"[81]

- Creating "opioid treatment programs [and] Substance Alternative Clinics . . . that provide a comprehensive treatment program for persons addicted to heroin or other opioids" and "[i]n addition to intense counseling, many treatment programs prescribe additional drugs to treat opioid addiction."[82]

These allegations do not seek recovery for any specific, individualized bodily injury. Rather, they seek recovery for the underlying plaintiffs' economic losses. CVS argues that at least some of the underlying plaintiffs sought compensatory damages in their lawsuits.[83] But the damages are not covered under the policies because they compensate the plaintiffs for their own *economic* losses.

The plaintiffs in the nine representative government lawsuits did not show that their damages were specific and individualized. Therefore, under *Rite Aid*, no coverage is available under the Chubb and AIG Policies.

---

[81] A1364 (*Suffolk County* Compl. ¶ 44).

[82] A1567 (*Suffolk County* Compl. ¶¶ 719–20).

[83] Opening Br. at 34.

21

B.

CVS also asks us to consider these lawsuits as derivative actions brought by governments on behalf of individuals who suffered bodily injury.[84] To illustrate the derivative nature of the claims, CVS points to the following allegations in *Florida*:

- CVS's "actions dramatically increased inappropriate opioid prescribing and use nationwide and in Florida and injured the State of Florida and its citizens."[85]

- "The public nuisance created by [CVS] has imposed severe economic costs on the State of Florida, its residents, and its communities."[86]

- "The State of Florida, acting on its own behalf and on behalf of its residents, therefore seeks monetary relief from [CVS]."[87]

- Alleging "damages suffered by the State of Florida and its citizens[.]"[88]

CVS also argues that *Philadelphia* and *Summit* are derivative claims covered by the policies. According to CVS, *Philadelphia* is derivative in nature because the city wanted CVS "to pay for" care and treatment "of every Resident in the City currently

---

[84] *Id.* at 35.

[85] A2049 (*State of Florida* Compl. ¶ 415).

[86] A2062 (*State of Florida* Compl. ¶ 472).

[87] *Id.*

[88] A2064 (*State of Florida* Compl. ¶ 482).

suffering from opioid addiction attributable to prescription opioids."[89] And *Summit* is supposedly derivative in nature because the county sued "on behalf of the municipal corporation and its residents."[90]

The problem with CVS's derivative claims argument is that none of these claims seek recovery for an *individual's* bodily injury. For example, although *Summit* states that the lawsuit was filed "on behalf of the municipal corporation and its residents,"[91] it also states that the plaintiffs "are asserting their own rights and interests and the [p]laintiffs' claims are not based upon or derivative of the rights of others."[92] The two allegations, read together, suggest that *Summit* seeks to recover generalized damages incurred by the municipality and its residents but not damages because of specific, individualized bodily injury.

CVS urges us to consider certain statements Chubb made in *Zogenix, Inc. v. Federal Insurance Co.* that confirm Chubb would have considered *Florida* and *Summit* as covered derivative cases.[93] According to CVS, Chubb argued that:

> (i) coverage is triggered "if the claimant seeks compensation . . . for injuries suffered by that claimant or for injuries suffered by another person on whose behalf the claimant has the right to seek recovery;"

---

[89] A1746 (*City of Philadelphia* Compl. ¶ 20).

[90] A433 (*Summit County* Compl. ¶ 978).

[91] *Id.*

[92] A443 (*Summit County* Compl. ¶ 1033).

[93] 2021 WL 6058252 (N.D. Cal. 2021).

23

(ii) "coverage extends to certain derivative claims 'resulting . . . from . . . bodily injury' such as . . . a hospital's subrogation claim for medical expenses paid on behalf of an injured claimant"; and (iii) "suits for medical expenses paid on behalf of an injured spouse or child are derivative."[94]

Chubb argues that derivative claims seeking coverage for injuries to specific individuals are covered under the policies. But here, as discussed above, the government lawsuits do not seek recovery for any individual's bodily injuries. As such, Chubb's argument in *Zogenix* does not advance CVS's position in this case.[95]

## C.

In *Rite Aid*, we did not directly address whether the "individualized, specific" requirement applied to property damage claims. CVS contends that *Rite Aid* does not apply because "the issue was not before the *Rite Aid* Court."[96] According to CVS, "property damage" should be treated differently from bodily injury claims because "they are different coverages with different allegations required to trigger

---

[94] Opening Br. at 36 (quoting A2382 (Def. Fed. Ins. Co.'s Opp. to Zogenix's Mot. Part. Summ. J. and Notice. Mot. and Cross-Mot. for Pl. Summ J. at 16)) (emphasis removed).

[95] CVS also asks us to consider *Walmart v. Ace American Insurance Co.* – a 2023 order by an Arkansas trial court – so that we may "recognize the material distinctions between the present case and Rite Aid." Reply Br. at 20. *See Walmart v. Ace American Ins. Co.*, 2023 WL 9067386 (Ark. Cir. Ct. Dec. 29, 2023) (ORDER). Because *Walmart* explicitly rejected *Rite Aid*, it is at odds with Delaware law. Accordingly, *Walmart* does not alter how we apply *Rite Aid* to determine coverage for the nine representative governmental lawsuits.

[96] Reply Br. at 21–22.

them."[97]  And under Delaware law, CVS says, insurers cannot interpret property damage as "economic loss" to avoid fulfilling their coverage obligations.[98]

We see no reason to treat "bodily injury" and "property damage" differently for coverage purposes.  The terms appear side-by-side in several provisions in both the Chubb and AIG Policies.[99]  And both terms are subject to the policies' "because of" and "occurrence" requirements.[100]  It would be inconsistent to require specific and individualized personal injury damage but permit general economic property damage.  As such, we conclude that *Rite Aid* applies equally to property damage coverage claims.

CVS contends that the Insurers' duty to defend is triggered because the nine representative lawsuits alleged covered property damage.[101]  As an example, CVS points out that the Track One Lawsuits assert claims under an Ohio state statute permitting civil action damages for property damage.[102]  CVS also highlights the following allegations in other cases:

---

[97] *Id.*

[98] *Id.*

[99] *See, e.g.*, A2090 (ACE 2014 Policy at 1); A2219 (AIG 2008 Policy at 1).

[100] A2090 (ACE 2014 Policy at 1); A2219 (AIG 2008 Policy at 1).

[101] Opening Br. at 38–39.

[102] *Id.* at 39.

- *Cuyahoga*: "Costs associated with extensive clean-up of public parks, spaces and facilities of needles and other debris and detritus of opioid addiction[.]"[103]

- *Florida*: CVS's "conduct has contributed to . . . property damage[.]"[104]

- *Cherokee Nation*: "Damages suffered by Cherokee Nation include . . . property damage . . . caused by opioids."[105]

- *Lake County* and *Trumbull County*: Miscellaneous allegations of "property damage."[106]

None of these lawsuits, however, allege damage to any specific property. Rather, they allege general increases in cleanup costs and generalized harm to property caused by opioids. Several allegations are interpreted out of context. For example, the allegation in *Florida* states: "Defendants' conduct has contributed to . . . personal injuries [and] . . . property damage . . . . The State of Florida is expending extraordinary resources to address these and other social problems resulting from the opioid crisis and will continue to expend resources addressing these problems."[107] The allegation in *Lake County* and *Trumbull County* states: "As a direct and proximate result of Defendants' tortious conduct and the public nuisance

---

[103] A798 (*Cuyahoga County* Compl. ¶ 1015(k)).

[104] A2052 (*State of Florida* Compl. ¶ 425).

[105] A1050 (*Cherokee Nation* Compl. ¶ 14).

[106] A1037 (*Lake County* Compl. ¶ 641); A1338 *(Trumbull County* Compl. ¶ 641).

[107] A2052 (*State of Florida* Compl. ¶ 425).

created by Defendants, Plaintiff has suffered and will continue to suffer stigma damage, non-physical property damage, and damage to its proprietary interests."[108] Both allegations discuss general harm to property. But neither seeks recovery for actual, specific, and individualized property damage.

CVS also argues that property damage lawsuits brought by municipalities are covered under the policies.[109] CVS relies heavily on *Fresno*, an exemplar lawsuit not part of the nine representative lawsuits. In *Fresno*, the plaintiff alleged that "the County has suffered damages to its infrastructure, which will need to be retrofitted and repaired as a result of" CVS facilitating opioid addiction and abuse.[110] These alleged infrastructure damages include damage to the county's jail, probation system, district attorneys, health and human services, sheriff and law enforcement, public health system, medical examiners, and public defenders.[111] These broad and generalized allegations do not meet the specificity requirement we required in *Rite Aid*.

CVS points to various Delaware and federal cases rejecting the Insurers' attempts to reframe "compensatory damages" (covered) as "purely economic losses"

---

[108] A1037 (*Lake County* Compl. ¶ 641) (emphasis added); A1338 (*Trumbull County* Compl. ¶ 641) (emphasis added).

[109] Opening Br. at 40.

[110] A5512 (*City of Fresno* Compl. ¶ 444).

[111] A5513–14 (*City of Fresno* Compl. ¶ 445).

(not covered).[112] Yet contrary to CVS's suggestion, there is no evidence that the Insurers are attempting to avoid their defense obligations by improperly classifying "compensatory damages" as "purely economic losses." None of the nine representative lawsuits alleged specific and particularized property damage. And *Fresno* merely alleged generalized harm to its municipal entities. Accordingly, property damage coverage is not available under the Chubb and AIG Policies.

IV.

Turning to the exemplar lawsuits. CVS contends that, under *Rite Aid*, lawsuits brought by hospitals, medical providers, and third-party payors to recover their actual, demonstrated costs of treating bodily injuries caused by opioid overprescription trigger coverage under the Chubb and AIG Policies. As explained below, coverage is unavailable because these lawsuits do not contain specific and individualized allegations of "bodily injury."

A.

In *Rite Aid*, we held that "[i]f the [c]ounties ran public hospitals and sued [the insured] on behalf of these hospitals to recover their actual, demonstrated costs of

---

[112] *See New Castle Cnty. v. Hartford Acc. & Indem. Co.*, 933 F.2d 1162 (3d Cir. 1991) (underlying lawsuit sought costs for cleaning up pollution from two landfills); *Harleysville Mut. Ins. Co. v. Sussex Cnty.*, 831 F. Supp. 1111 (D. Del. 1993) (underlying lawsuit sought costs for cleaning up pollution from a landfill); *Tyson Foods, Inc. v. Allstate Ins. Co.*, 2011 WL 3926195 (Del. Super. Ct. Aug. 31, 2011) (underlying lawsuit sought costs for contaminating a watershed).

28

treating bodily injuries caused by opioid overprescription, [coverage] would most likely be triggered."[113]  The alleged damages must depend on proof of specific and individualized bodily injury.[114]

CVS argues that the public hospital lawsuits satisfy *Rite Aid* because the counties are seeking to recover damages on behalf of public hospitals.[115]  They point to the allegations in complaints from three exemplar public hospital lawsuits – *Dallas County*, *Bunkie General*, and *Bristol Bay*:

- *Dallas County*: The plaintiffs "have treated, and continue to treat, numerous patients for opioid-related conditions."[116]

- *Dallas County*: The plaintiffs "have incurred and continue to incur substantial unreimbursed costs for their treatment of patients with opioid-related conditions. These patients with opioid-related conditions seek treatment from [p]laintiffs as a proximate result of the opioid epidemic created and engineered by [defendants like CVS]."[117]

- *Dallas County*: The plaintiffs "have incurred and continue to incur operational costs in the form of surgical procedures and other care that have been and are more complex and expensive than would otherwise be the case if the patients were not opioid affected."[118]

---

[113] *Rite Aid*, 270 A.3d at 253–54.

[114] *Id.* at 252–54.

[115] Opening Br. at 13.

[116] A3648 (*Dallas County* Compl. ¶ 56).

[117] *Id.* (*Dallas County* Compl. ¶ 57).

[118] *Id.* (*Dallas County* Compl. ¶ 58).

29

- *Dallas County*: "As a result of Defendants' actions, Plaintiffs have suffered a special injury, different from that suffered by the general public at large[,] by individual users[,] and by governmental entities, namely that [p]laintiffs have incurred costs by providing uncompensated care for patients suffering from opioid-related conditions."[119]

- *Bunkie General*: "[F]or the indigent, uninsured or underinsured patient, . . . costs are being passed down to, and absorbed by, hospitals and other medical and healthcare providers who are obligated to treat addicted persons and do not receive full or any financial reimbursement for their services and treatment."[120]

- *Bunkie General*: The plaintiff "have treated, and continues to treat, numerous patients for opioid-related conditions, including opioid overdose and opioid addiction."[121]

- *Bristol Bay*: "Health care providers throughout the State of Alaska, including Alaska Native tribal health organizations, have faced overwhelming costs as a direct result of this public health crisis." The plaintiff "has suffered substantial loss of resources, economic damages, and increased costs in responding to the opioid epidemic."[122]

It is true that the counties are seeking recovery on behalf of the public hospitals. The problem is that the underlying complaints do not allege actual specific and individualized damage and are not predicated on proving damage on an

---

[119] A3938. (*Dallas County* Compl. ¶ 1071).

[120] A4191 (*Bunkie General* Compl. ¶ 747).

[121] A4202 (*Bunkie General* Compl. ¶ 790).

[122] A4330 (*Bristol Bay* Compl. ¶ 9).

individual basis. Rather, the complaints reference unreimbursed treatment costs and an increase in operating costs. For example, in *Bunkie General*, the complaint alleges only monetary damages from treating "numerous patients for opioid-related conditions" but does not allege any specific and individualized damage.[123] In *Bristol Bay*, the complaint alleges generalized "loss of resources, economic damages, and increased costs in responding to the opioid epidemic" but does not allege any specific and individualized damage.[124] In fact, in *Dallas County*, the underlying complaint explicitly disclaimed the individualized injury argument. The complaint stated that the county's injury was "different from that suffered by the general public at large[,] by individual users[,] and by governmental entities."[125] Because the underlying complaints do not allege specific and individualized damages, under *Rite Aid*, coverage is unavailable for the public-hospital lawsuits.

B.

CVS also argues that other hospital and medical provider lawsuits satisfy *Rite Aid*. They point to complaints from three exemplar hospital operator and medical provider lawsuits – *Clinch County*, *Lester E. Cox*, *Bon Secour (Maryland)*, and *Fayetteville*:

---

[123] A4202 (*Bunkie General* Compl. ¶ 790).

[124] A4330 (*Bristol Bay* Compl. ¶ 9).

[125] A3938. (*Dallas County* Compl. ¶ 1071).

- *Clinch County*: The plaintiff "directly and foreseeably sustained all economic damages alleged[,]" including "(1) costs for providing medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (2) costs for providing treatment, counseling, and rehabilitation services; (3) costs for providing treatment of infants born with opioid-related medical conditions; (4) costs associated with public safety relating to the opioid epidemic; (5) and costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation."[126]

- *Lester E. Cox*: "As a result of the opioid dependence epidemic, . . . opioid-dependent patients routinely occupy beds in hospitals, including hospitals operated by [the plaintiffs]."[127]

- *Lester E. Cox*: "Increased numbers of opioid-dependent patients have continued to cause substantial financial burden on [the plaintiffs]. [The plaintiffs] have borne substantial reimbursement shortages when they have continued to treat opioid-dependent patients with opioid-related conditions or comorbidities."[128]

- *Bon Secour (Maryland)*: Defendants including CVS have caused damages to the plaintiffs with "unreimbursed and/or uncompensated costs incurred for the treatment of patients who suffer from conditions related to or caused by opioid use[.]"[129]

- *Fayetteville*: The plaintiffs "have incurred and continues to incur operational costs related to the time and expenses in diagnosing,

---

[126] A2654 (*Clinch County* Compl. ¶ 9).

[127] A4548 (*Lester E. Cox* Compl. ¶ 43).

[128] A4552 (*Lester E. Cox* Compl. ¶ 60).

[129] A4884 (*Bon Secours (Maryland)* Compl. ¶ 8).

testing, and otherwise attempting to treat [individuals addicted opioids].”[130]

- *Fayetteville*: The plaintiffs “have suffered a special injury, different from that suffered by the general public at large[,] by individual users[,] and by governmental entities[.]”[131]

CVS argues that “[f]or purposes of the duty to defend analysis, [the hospital and medical provider payor exemplar lawsuits] are no different from the hospital and medical provider lawsuits because they seek, as damages, actual costs incurred for treating opioid addiction.”[132] Once again, however, the problem is that, like the public hospital lawsuits, the complaints do not allege specific and individualized damage.

We are unpersuaded by CVS’s arguments to the contrary. For example, CVS contends that *Lester E. Cox* alleges “substantial reimbursement shortages when [the medical providers] have continued to treat opioid-dependent patients with opioid-related conditions or comorbidities.”[133] But CVS does not connect these “reimbursement shortages” to the “specific and individualized” damages.

---

[130] A5057 (*Fayetteville* Compl. ¶ 57).

[131] A5356 (*Fayetteville* Compl. ¶ 823).

[132] Opening Br. at 21.

[133] *Id.* at 17 (quoting A4552 (*Lester E. Cox* Compl. ¶ 60)).

CVS makes a similar argument regarding *Bon Secours (Maryland)* – that the complaint alleged "substantial expenditures, for which [the underlying plaintiffs] have not received any compensation."[134] But again, CVS does not explain how these "substantial expenditures" are specific and individualized. Additionally, CVS argues that *Fayetteville* is different because it alleges "special injury."[135] But this "special injury" is the same generalized unreimbursed or uncompensated medical care costs, which are *different from* the injury "suffered by the general public at large[,] *the individual users*[,] and by the governmental entities[.]"[136]

Because the complaints do not allege specific and individualized damages, coverage is unavailable for the other hospital and medical provider lawsuits.

## C.

CVS contends that the third-party payor suits "potentially trigger coverage under *Rite Aid*."[137] It cites *Southern Tier* as an exemplar. In *Southern Tier*, the underlying plaintiff alleged that it paid "significant costs for opioid addiction treatment for covered members" and "medical care needed to treat opioid side

---

[134] *Id.* at 17–18 (quoting A4883 (*Bon Secours (Maryland)* Compl. ¶ 60)).

[135] Opening Br. at 19.

[136] A5356 (*Fayetteville* Compl. ¶ 823) (emphasis added).

[137] Opening Br. at 20.

effects[.]"[138]  The underlying plaintiff also alleged that "[t]he economic impact of prescription opioid overdose on Plaintiff is well in line with national trends."[139]  These allegations do not concern specific bodily injuries to an individual.  Rather, they concern aggregate economic harm which is not covered by the policies.

CVS directs us to *Cincinnati Insurance Co. v. H.D. Smith, L.L.C.*[140]  In *H.D. Smith*, the Seventh Circuit analogized the MDL opioid lawsuits claims to a mother suing to recover her own costs incurred while treating a child.[141]  CVS argues that "[t]here is no distinction . . . between a mother who incurs costs for her son's medical care and a third-party payor that incurs costs for its member's medical care."[142]  But, as we explained in *Rite Aid*, the former seeks actual specific costs for individualized medical care, whereas the latter does not.  Coverage is unavailable for the third-party payor lawsuits.

---

[138] A5897 (*Southern Tier* Compl. ¶¶ 777–78).

[139] A5899 (*Southern Tier* Compl. ¶ 786).

[140] 829 F.3d 771 (7th Cir. 2016).

[141] *Id.* at 774–75.

[142] Opening Br. at 21.

Finally, CVS argues that it was premature for the Superior Court to grant summary judgment under "indemnity-only" policies.[143]  According to CVS, "[a]n insurer's duty to indemnify is determined after 'the facts are actually established.'"[144]  CVS contends that the facts are not fully established and therefore the indemnification claim was not yet ripe.

In general, "an insurer's duty to defend is broader than the substantive coverage afforded under its policies."[145]  The duty to defend "is limited to suits which assert claims for which it has assumed liability under the policy. . . . The test is whether the complaint alleges a risk within the coverage of the policy."[146]  Under certain limited circumstances, however, an insurer may ultimately need to indemnify the insured even though it had no duty to defend the claims.

For example, in *Premcor Refining Group, Inc. v. Matrix Service Industrial Contractors, Inc.*, the insurance policy required that an independent contractor's

---

[143] Opening Br. at 44.

[144] *Id.* at 44 (quoting *Com. Assocs., LP v. Hanover Ins. Co.*, 2022 WL 539000, at *7 (Del. Super. Ct. Feb. 22, 2022)).

[145] *Charles E. Brohawn & Bros., Inc. v. Emps. Com. Union Ins. Co.*, 409 A.2d 1055, 1058 (Del. 1979).

[146] *Id.  See also Health First, Inc. v. Capitol Specialty Ins. Corp.*, 747 F. App'x 744, 750 (11th Cir. 2018) ("[T]he duty-to-defend test can be used to assess whether the underlying facts could possibly give rise to a duty to indemnify. A determination that there is no duty to defend, in other words, is also a determination that there is no duty to indemnify.").

work cause the injury.[147]  The court found that, because the underlying complaint did not allege this causation, the insurer had no duty to defend the claim.[148]  The court denied summary judgment as to the duty to indemnify, however, because there was a factual question about the independent contractor's actual involvement which might ultimately lead to coverage.[149]

Here, as discussed earlier, the Insurers did not have a duty to defend CVS because the underlying lawsuits do not allege specific and individualized personal injury or property damage.  Unlike *Premcor*, in which coverage turned on the extent to which the independent contractor's work caused or otherwise contributed to the injury, there is no unresolved factual issue here.  And to the extent that the pleadings or underlying lawsuits unexpectedly transform into ones alleging damage from specific and individualized bodily injury and property damage, the Insurers conceded at oral argument that CVS could tender a new claim for coverage at that time.[150]

---

[147] 2009 WL 960567 (Del. Super. Ct. Mar. 19, 2009).

[148] *Id.* at *11.

[149] *Id.* at *11–12.

[150] Videotape: 2025-06-25 482, 2024 In Re: CVS Opioid Insurance Litigation, at 37:55–38:12 (Del. 2025) (accessible at https://courts.delaware.gov/supreme/oralarguments/).

CVS also relies on *Central Illinois Light Co. v. Homes Insurance Co.*[151] There, the Illinois Supreme Court addressed whether the insurers had a duty to indemnify before a lawsuit or other adversarial proceeding had been filed. The court held that the duty to indemnify in indemnity-only policies "cannot be predicated on the duty to defend because under no circumstances will these policies impose a duty to defend."[152] In other words, the duty to indemnify is not, without exception, predicated on the duty to defend.

Here, the Superior Court did not base its conclusion regarding the Insurers' duty to indemnify on its decision regarding their duty to defend. The court examined the underlying lawsuits and determined that the *nature* of the claims and the relief sought by the underlying plaintiffs do not fall within the scope of coverage.[153] As such, coverage was unavailable under both duties. *Luria Brothers v. All Assurance Co.* confirms our conclusion.[154] There, the Second Circuit held that coverage is available only if the policies covered the *type* of liability asserted in the underlying complaint.[155] Here, the allegations do not involve specific and individualized

---

[151] 821 NE.2d 206 (Ill. 2004).

[152] *Id.* at 158.

[153] *First Superior Court Decision* at 1216.

[154] 780 F.2d 1082 (2d Cir. 1986).

[155] *Id.* at 1087–88.

personal injury or property damage and therefore are not the type of liability covered under the policies.[156]

According to CVS, its national settlement agreement is a "transformative document" demonstrating that CVS had been sued for "damages because of 'bodily injury.'"[157]  But settlement agreement language is not a reliable coverage indicator because "[t]o do so would encourage litigants to manipulate settlement language to secure [] insurance coverage where it would otherwise not exist."[158]  CVS argues that manipulation was impossible here because the settlement was a "complex and comprehensive agreement [that] involve[d] billions of dollars and was negotiated with the Settling States and their Attorneys General."[159]  But the settlement process can leave insurers on the outside and potentially be collusive.[160]  The national settlement agreement funds expenses in response to the opioid crisis at-large, but it

---

[156] CVS also relies on *Guaranteed Rate, Inc. v. ACE American Insurance Co.*  2022 WL 4088596 (Del. Super. Ct. Aug. 24, 2022).  *Guaranteed Rate* largely concerned whether the insured lacked knowledge of a claim such that it could have been included in a settlement.  It is a poor fit for this case.

[157] *Id.* at 46–47.

[158] *In re AmerisourceBergen Corp. (n/k/a Cencora) Del. Ins. Litig.*, 2024 WL 5203047, at *10 (Del. Super. Ct. Dec. 23, 2024).

[159] Reply Br. at 25.

[160] *See, e.g., AIG Specialty Insurance Co. v. Conduent State Healthcare, LLC*, 2025 WL 369450, at *2 (Del. Feb. 3, 2025) (as part of settlement negotiations, the insured insisted plaintiff amend its petition to support breach of contract and negligence claims to add causes of action for breach of contract and negligence with the "hope and expectation that [the Insurers] would change their coverage positions and agree to contribute to funding a settlement."  *Id.*  (citation omitted).

does not change the fact that the underlying lawsuits do not seek specific damages tied to individualized injuries and trigger coverage.

## VI.

The judgment of the Superior Court is affirmed.